Brian R. GERMANO, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 91–1179C.

United States Claims Court.

Oct. 23, 1992.

Michael J. Gaffney, Washington, D.C., for plaintiff.

Sean P. Murphy, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on defendant's motion to dismiss and cross-motions for summary judgment. The issue is whether a naval reserve officer is entitled to reinstatement to active duty status after the termination of a minimum service obligation when the Secretary of the Navy has exercised his discretion to override a correction board's decision recommending relief.

## FACTS

The following facts derive from the administrative record. Brian R. Germano ("plaintiff") enlisted in the United States Navy (the "Navy") in October 1983. After having completed the Naval Aviation Officer Candidate Course, plaintiff was appointed an Ensign in the Naval Reserve on May 11, 1984. He incurred a four-year minimum service obligation. Between 1984 and 1988, he served on active duty, after which he was honorably discharged. Plaintiff then joined the United States Naval Reserve (the "Reserves"), in which he served until May 1990 when he was discharged by the Navy for twice failing to be promoted to the rank of lieutenant.

### 1. Plaintiff's active duty

In 1984 plaintiff completed the Naval Officer Candidate Course and was appointed to the rank of ensign. Plaintiff then successfully completed the Intelligence Officer Course. Plaintiff's first operational duty assignment was to Attack Squadron 52 ("VA–52"), where he served as an intelligence officer from December 10, 1984, to April 18, 1986. He was one of two intelligence officers assigned to VA–52 aboard the USS Carl Vinson. The other intelligence officer, Ensign Jeffrey L. Canfield ("Ens. Canfield"), assigned to VA–52 earlier in 1984, was designated plaintiff's immediate supervisor (division officer).

In 1985 plaintiff received the first of several Officer Fitness Reports ("OFRs") that form the basis of this case. OFRs assess an officer's performance in a number of categories and award letter grades rating that performance. OFRs can be designated either "regular," "concurrent," "regular-concurrent," or "special."[1] The first contested OFR that plaintiff received at VA–52, from the then Commanding Officer, Commander Donald Sullivan ("Cdr. Sullivan"), covered December 3, 1984, to May 31, 1985.[2] This report, which indicates that it was based on "close" observation (block 18), placed plaintiff in the second highest category in block 51 ("Mission Contribution–Evaluation"). The lowest letter grade assigned to plaintiff was "C"; the narrative included no negative comments. Commander J.M. Burin ("Cdr. Burin") replaced Cdr. Sullivan as plaintiff's regular reporting Commanding Officer following Cdr. Sullivan's detachment from VA–52.

Plaintiff and Ens. Canfield did not get along. By all accounts a severe clash of personalities ensued between the two intelligence officers. Plaintiff meticulously documented their almost daily verbal altercations, on which numerous officers re-

---

1. A "regular" report is a periodic evaluation prepared by an officer's commanding officer. A "concurrent" report is usually prepared by a commanding officer supervising an officer during a temporary assignment. A "special" report is a report submitted at the time of a specific

personnel action (such as detachment for cause).

2. The OFR originally covered the period from December 3, 1984, through May 31, 1985, but that period was extended until July 26, 1985, the date of Cdr. Sullivan's detachment.

marked. Cdr. Burin authorized Ens. Canfield's input into plaintiff's OFR, although Ens. Canfield, who was senior to plaintiff due to time in grade, held the same rank as plaintiff and competed with plaintiff on fitness evaluations. Apparently, there was no irregularity in this practice.

In a memorandum dated February 27, 1986, Ens. Canfield advised Cdr. Burin that his "dissatisfaction with [plaintiff's] performance of duties and conduct as an officer ... has recently reached what ... [he] consider[ed] to be an intolerable level." Ens. Canfield specified the following complaints concerning plaintiff: (1) committing security violations; (2) jumping the chain of command; (3) failing to lead and manage personnel effectively; (4) and performing duties in a haphazard manner.

In a memorandum dated April 12, 1986, Cdr. Burin formally requested plaintiff's Detachment for Cause ("DFC") "due to unsatisfactory performance of duty over an extended period of time." The request detailed plaintiff's inability to perform his duties in a satisfactory fashion; to work with others; to manage enlisted personnel; to prioritize assignments; to present thorough briefings; to utilize fully relevant source material; to assist planning crews with exercises; to accept counseling and criticism; and to understand security procedures. The DFC request further elaborated that plaintiff's performance had deteriorated and that he had "never been a team player while attached to this command." The request stated that plaintiff was "not capable of effectively functioning as an intelligence officer." As part of the DFC action, Cdr. Burin requested plaintiff's transfer to Temporary Active Duty ("TAD") at the Naval Air Station, Whidbey Island, Washington.

Cdr. Burin supplemented his request for DFC with three letters. The first, from Lt. Cdr. R.J. Templer, dated February 28, 1986, stated that he had observed plaintiff "closely" and that his "performance ... [is] not at an acceptable level for a squadron Intelligence Officer and that he should be relieved." The Templer letter stated that plaintiff displayed a "reluctant attitude and a total lack of motivation and initiative." The letter also echoed Cdr. Burin's comments that plaintiff was an ineffective leader. The second letter, written by Lt. Cdr. P.S. Kenney to VA–52 and dated April 1986, noted that "[plaintiff's] ability to accept direction from his superiors was in question...." and noted his generally poor performance and "lack of response to counseling." The third letter offered in support of Cdr. Burin's request was Ens. Canfield's letter of February 27, 1986.[3]

In support of this request, Cdr. Burin submitted a special OFR for July 27, 1985, to April 18, 1986. This report, also indicating "close" observation (block 18), placed plaintiff in the lowest category in block 51 ("unsatisfactory") and assigned several marks of "I" (lowest possible), and its narrative was entirely derogatory, with no positive comment. The evaluation included the statements that "Ensign Germano is not suited to the military organization. He has become an administrative burden to the command...." The highest grade assigned was "E" in block 35 ("Equal Opportunity"), in which plaintiff had been graded "A" in the immediately preceding report at issue. The special OFR assigned marks of "F" and "N" (not observed) in blocks 36 and 37 ("Speaking Ability" and "Writing Ability"), whereas in the immediately preceding report at issue, plaintiff had been marked "A" in both categories. The special OFRs' narrative did not include an explanation for the grades assigned in blocks 35 through 37.

Cdr. Burin also submitted a regular OFR, in addition to the special OFR prepared in support of the request for DFC. The two reports mirrored each other in every respect, except that the regular OFR extended through April 23, 1986, while the special OFR covered the period to April 18, 1986. Both reports included precisely the same failure to punctuate the final sentence:

Ensign Germano is not suited to the military organization. He has become an

---

**3.** None of the quoted letters commented on plaintiff's post–April 1986 performance.

administrative burden to the command. He has been counseled numerous times and given every opportunity to change his attitude and improve his performance but he is unresponsive. Ensign Germano is not recommended for promotion [sic] [4]

On April 29, 1986, Cdr. Burin delayed plaintiff's scheduled promotion to Lieutenant–Junior Grade ("LTJG") pending the DFC. A statement from Cdr. Burin to plaintiff also advised plaintiff that he could make a statement to the Chief of Naval Personnel ("CHNAVPERS") in response to the DFC action. Plaintiff requested 15 working days to respond to the allegations contained in the letter and special report.[5] Cdr. Burin denied this request.

Plaintiff submitted a lengthy rebuttal to Cdr. Burin's DFC request, including 13 letters and sworn or unsworn statements from other naval intelligence officers both of equal rank or senior to him with knowledge of the events at VA–52.[6] The statements supported plaintiff and criticized the allegations lodged against him. The following are representative:

> An important part of LTJG Canfield's allegations concerning Germano state that he is unable to work with others. This is not true by any stretch of the imagination. I found Germano extremely willing to learn, responsive with the tasks that I was able to give him through the graciousness of Canfield, and accurate in his presentations to aircrew.... Additionally, unbeknownst to Canfield, Germano tasked my squadron through me to provide VA–52 aerial photography for mission planning purposes. With some of this photography Germano was able to update his squadron[']s target folders and provide target orientation.... Conversely, I was unable on several occasions to receive similar responsiveness from ENS Canfield....
>
>  ....
>
> In conclusion, ENS Germano is an extremely hard worker, working longer

hours than his peers with the sole exception of ENS Canfield. Germano outperformed 90 percent of the intelligence officers I know. He was highly responsive to the demands placed upon him by the Vinson and by VF–111, organizations to which I played a key part in the interface with VA–52. I would be pleased to have him work both for me and with me on a professional basis.... (Statement of Lt. James V. Hardy, undated.)

> ENS Germano is one of Mission Planning's most thorough and diligent researchers, as is evidenced by his extremely well organized and researched tactical area folders. His total familiarity with the resources available and their locations has aided me in my efforts a number of times.
>
> In the area of officer/enlisted relations, ENS Germano has consistently displayed low key and fair leadership. He tasks the Mission Planning IS's effectively and with outstanding results. (Statement of Lt. Richard Holcomb, undated.)

> Far from being the useless incompetent described by Ltjg Canfield, Ens Germano was much more capable and hardworking than many of his airwing peers—none of whom have had any such actions taken against them. (Letter from LTJG Terrell R. Williams, May 7, 1986.)

> He has produced tactical area folders that are among the best I have ever seen. (Sworn Statement of Lt. Christopher P. Woodruff, Apr. 24, 1985.)

A number of fellow officers commented on Ens. Canfield's ability to manage individuals or pass fair and accurate judgment on them:

> ENS Canfield was a bit of a bully and would gladly walk up your chest and over your face if you would stand still for it.
>
>  ....

---

**4.** All narrative comments were block capitalized. In this opinion they are reproduced in lower case.

**5.** Navy regulations permit this response time.

**6.** Two statements were submitted by personnel junior to plaintiff. One statement was made by an officer of unknown rank.

I wish to go on record stating that, despite my earlier assessment of ENS Canfield's character, he was still one of the most competent and professional AI's whom I have seen. He knew how to produce the results his squadron wanted, and quickly. It was his method of obtaining these results that I disliked.... (Statement of LTJG John P. Savage, June 23, 1986.)

To his credit, LTjg Canfield is widely regarded as an excellent Intelligence Officer in most respects. The manner in which he accomplishes this however, includes treating the IS's who work for him more like personal "slaves" than as subordinates. He extended this treatment to Ens Germano.

....

Ltjg Canfield hounded and berated Ens Germano constantly about any and everything from the time he checked aboard, and was incensed that Ens Germano would not respond to his every whim. (Williams Letter.)

Some of the statements expressed a skepticism about how plaintiff was rated:

Ltjg Canfield's assertions regarding Ens Germano's utilization of chain of command, if true, are a direct result of Ltjg Canfield's reliance on his perc[ei]ved status as a means of intimidation. Junior officers—especially 01's and 02's, are *not* usually responsible for supervising one another. Rather, it is normally a relationship of peers, with each learning from the other's experiences. Ltjg Canfield's direct assertion that he was "boss" and the squadron's apparent condoning of this impractical situation created an environment in which it would have been impossible for any new Ensign to succeed.

....

... I found him [plaintiff] congenial, intelligent, hard-working and motivated. He arrived at the squadron at mid-cruise, after the rest of the ship and air wing had gained extensive experience during workups and a very demanding initial 2 months of deployment. He was very willing and eager to learn but, as in the case with all of us when first reporting aboard, had much to learn. The circumstances in which he was placed made it impossible to do so however, since Ltjg Canfield's treatment of him was never, in my estimation, that of a fellow junior officer, but rather that of a domineering, egomaniac, intent on making himself look good, regardless of the [e]ffect on others—including Ens Germano. (Williams Letter; emphasis in original.)

It is not uncommon to find friendly competition take place between two intelligence officers assigned to the same squadron. In this particular situation, it is my opinion that Ensign Germano's colleague did not want any competition, and took steps to ensure that was the case. One example is the fact that Ensign Germano has never been permitted to assume the duties of Radar Targeting Officer, despite official orders directing him to do so. LTJG Canfield has assumed the duties of AIO and Radar Targeting Officer, and has directed Ensign Germano to be his assistant. Ensign Germano has not been able to fully utilize the skills that he acquired during intelligence officer training. (Woodruff Statement.)

In exacerbation of this situation, the squadron command structure apparently condoned Ltjg Canfield's actions to the point of allowing him to write Ens Germano's annual fitness report! It is impractical in any case for officers of *equal* rank to objectively evaluate their peers in any official manner. For an Ensign, who had (to the best of my knowledge) received only one previous fitness report himself, to write another Ensign's fitness report is outrageous. (Williams Letter; emphasis in original.)

The court has referred to statements, both favorable and unfavorable to plaintiff, that were before the correction board and the Secretary of the Navy's designee. Since the court does not sit as a "super-correction [board]," *Skinner v. United States*, 219 Ct.Cl. 322, 330, 594 F.2d 824, 829–30 (1979), the court in its review has not given any dispositive weight to them. However, both the correction board and the Secretary's designee are charged with hav-

ing evaluated the substantial allegations contained in these statements, as well as the ten other statements plaintiff submitted to the correction board.

On August 12, 1986, after reviewing the record, CHNAVPERS disapproved Cdr. Burin's DFC request. CHNAVPERS wrote that there was "not a record of detailed written guidance such as a Letter of Instruction documenting this young officer's poor performance and specifying what he must do to improve" and that there was "an absence of documented counseling directed towards specific events or behavior." The decision letter also advised that plaintiff would not remain assigned to VA–52. On August 21, 1986, CHNAVPERS ordered plaintiff's promotion to LTJG retroactive to May 11, 1986. As a further result of this decision, Cdr. Burin's special OFR and his DFC request letter were removed from plaintiff's file.[7] Cdr. Burin was directed to prepare a new detaching regular OFR with specific reference to Naval Military Personnel Manual § 3410100 5 (undated). On September 26, 1986, plaintiff was formally transferred to the Medium Attack Tactical Electronic Warfare Wing, U.S. Pacific Fleet (COMMATVAQW-INGPAC).

### 2. *Plaintiff's Article 1106 and Article 138 complaints*

On May 8, 1986, plaintiff filed a complaint with Cdr. Burin against Ens. Canfield pursuant to Article 1106 of the U.S. Navy Regulations. Plaintiff charged that Ens. Canfield used his position as Division Officer to "harm ... [plaintiff's] professional performance and career, and that he ... [Ens. Canfield] knowingly and willfully presented untrue, deceptive, and misleading allegations to the chain of command in his request for [plaintiff's] ... detachment for cause...." Plaintiff further requested restoration of any rights or privileges withheld as a result of Ens. Canfield's complaint. Plaintiff also asked for the following relief: (1) withdrawal of Ens. Canfield's

letter of February 27, 1986; (2) termination of the DFC proceedings; (3) withdrawal of the special and regular OFRs; (4) withdrawal of the denial of promotion to lieutenant (LTJG); (5) retroactive promotion; and (6) reprimand of Ens. Canfield. Plaintiff enumerated specific allegations of wrongdoing by Ens. Canfield and detailed plaintiff's efforts to ensure proper job performance. Plaintiff also specifically referred those reviewing the complaint to plaintiff's response to Cdr. Burin's DFC request. In a letter dated May 21, 1986, Cdr. Burin denied plaintiff's request for redress under Article 1106.

On June 2, 1986, plaintiff filed a complaint against Cdr. Burin under Article 138 of the Uniform Code of Military Justice, 10 U.S.C. § 938. The Article 138 complaint incorporated all of plaintiff's previous assertions concerning Cdr. Burin in the Article 1106 complaint. An informal investigatory report prepared by Captain Paul D. Frazer and sent to Commander, Carrier Group THREE ("CCG–3"), dated August 22, 1986, found that plaintiff's situation represented "an example of a gross inability of command and individual to achieve an effective working relationship" and that, despite plaintiff's failure to perform his primary duties to the satisfaction of the commander, plaintiff "displayed real ability working in the CV Intelligence Center on board USS Carl Vinson (CVN 70)." The report noted, as discussed below, that CHNAVPERS rejected Cdr. Burin's DFC request and deleted the special OFR. Consequently, "no additional redress of these alleged wrongs is possible...." The report nevertheless concluded, "I find ... [plaintiff's] allegations ... individually and in the aggregate, are wholly without substance. It is respectfully recommended that you advise the Secretary that you find no wrong to have been committed and no redress to be due." On August 31, 1986, CCG–3, Cdr. E.W. Clexton Jr., reported to the Secretary that the DFC rejection and deletion of the derogatory OFR granted the majority of redress sought by plaintiff.

---

**7.** Plaintiff's record did not contain either report at the time of the proceedings before the Board

for Correction of Naval Records.

Therefore, CCG–3 recommended that the Secretary deny plaintiff's Article 138 complaint.

In letters dated January 27, 1987, and March 23, 1987, the Secretary of the Navy's designee, Assistant Secretary of the Navy for Manpower and Reserve Affairs (the "ASN") Chase Untermeyer, denied plaintiff any relief beyond that which he had already received as part of the DFC rejection. In his January 27 letter, the ASN also confirmed CHNAVPERS' DFC denial and relief and observed: "The second report complained of, your detaching fitness report from VA 52, has not yet been submitted. Your reassignment outside VA–52 sufficiently protects you from any possible retaliation...." A copy of this letter was forwarded to Cdr. Burin. By letter of January 21, 1987, plaintiff requested that the ASN prevent Cdr. Burin from filing a detaching OFR to replace that expunged in the DFC proceeding. On March 23, 1987, the ASN denied this request noting: "Your request that a cover letter be inserted in your official record is premature. If [Cdr. Burin] ... submits a[n] ... [OFR] which you feel wrongs you, you may then complain." The ASN elaborated that the Navy was trying to get the overdue replacement OFR from Cdr. Burin. The letter continued, "If such report cannot be secured, a 'no-fault' memorandum will be inserted in your record...." Cdr. Burin also received notice of this letter.

### 3. *Plaintiff's transfer*

After plaintiff's transfer consequent to the rejection of the DFC, the COMMATVAQWINGPAC OFR for April 23, 1986, to September 26, 1986, assigned plaintiff 20 "A"s, rated him in the top one percent of officers evaluated during that period, and strongly recommended "promotion, augmentation into the regular navy and postgraduate education." Rear Admiral J.M.

Seely ("RDML Seely"), the rating officer, in a subsequent letter supporting plaintiff's promotion, wrote that plaintiff was "highly intelligent, motivated, dedicated to excellence and a team player who can be depended upon.... I consider him to be highly competitive with the best of his peers in the intelligence community...."

On May 18, 1987, Cdr. Burin finally submitted the replacement OFR ordered as part of the rejection of his DFC request. Before submitting the report, however, Cdr. Burin changed the reporting status of RDML Seely's TAD OFR from regular-concurrent to concurrent. He also extended the reporting period from its original ending date of April 1986 to September 1986.[8] The OFR is identical to the special report and the regular report submitted at the time of Cdr. Burin's failed attempt to detach plaintiff and repeats their narrative evaluations verbatim. The only difference is the addition of the following sentence to the narrative:

> He [plaintiff] has been sent TAD to COMMATVAQWINGPAC because I have lost confidence in his ability to perform intelligence officer duties for this command. LTJG Germano is not recommended for promotion.

On March 10, 1987, plaintiff received the contested OFR for September 27, 1986, to February 28, 1987, his second report from COMMATVAQWINGPAC and his first since his permanent transfer. The report contains straight "A"'s, except for "B"'s in blocks 30, 34 and 71 ("Subordinate Management and Development," "Response in Stressful Situations," and "Forcefulness"). The narrative includes the following statement that plaintiff considers negative: "LTJG Germano is a talented and capable officer who will undoubtedly prove himself upon assignment to a sea duty tour...."

---

**8.** The record gives no explanation for Cdr Burin's eight-month delay in submitting plaintiff's replacement OFR. Plaintiff implies that Cdr. Burin deliberately delayed submitting the OFR pending the final outcome of plaintiff's Article 138 action against him. While expressing no view on this allegation, the court discerns that Cdr. Burin violated NAVMILPERSCOMINST

1611.1, § 3–7 (May 1, 1981), by waiting eight months to submit the OFR. Cdr. Burin completed the OFR only after the ASN made it clear that he would take no further action on plaintiff's Article 138 complaint. Naval regulations permit a regular reporting senior to extend a rating period in certain circumstances. NAVMILPERSCOMINST 1611.1, § 3–7.

### 4. *Plaintiff's application to the correction board*

Plaintiff submitted an application to the Board for Correction of Naval Records (the "BCNR" or the "Board") on June 26, 1987, and an amended application on May 27, 1988. Ten additional statements from junior, fellow, and superior officers were tendered. Plaintiff requested that the BCNR: (1) remove from plaintiff's naval record the regular OFR for December 3, 1984, to May 31, 1985 (extended to July 26, 1985); (2) remove the OFR for July 27, 1985, to September 26, 1986; (3) change the TAD OFR for April 24, 1986, to September 26, 1986 to a regular report; (4) remove the regular OFR for September 27, 1986, to February 28, 1987; (5) place in plaintiff's record an explanation for his not being rated from December 3, 1984, to February 28, 1987; (6) strike plaintiff's failure for selection by the FY–88 Active Line Lieutenant Selection Board and show he was selected for promotion to lieutenant with an appropriate date of rank; (7) void plaintiff's release from active duty on May 31, 1988, and give him retroactive restoration to extended active duty in a commissioned status;[9] and (8) grant "such other and/or further relief as may be deemed necessary and/or appropriate in order to accord the applicant full and complete relief," to include removal of any and all documentation relating to the April 12, 1986, request for his DFC and removal of the CCG–3 letter of June 30, 1987, to the Naval Inspector General.

In July 1987 the FY–88 active duty Lieutenant Selection Board convened. The Selection Board recommended 94 percent of the in zone officers for promotion. The board did not select plaintiff for promotion, commonly referred to as a promotion passover or a failure of selection.

Prior to acting on plaintiff's request, the BCNR requested an advisory opinion from the Personnel Evaluations Division of the Naval Military Personnel Command ("NMPC"). In its advisory opinion of July 24, 1987, NMPC–32D recommended retention of the OFRs for December 3, 1984, to May 31, 1985 (extended to July 26, 1985);

and July 27, 1985, to September 26, 1986. (The opinion did not address the contested OFR for September 27, 1986, to February 28, 1987, since this report was not contested until after submission of the opinion.) The opinion forwarded responses received from Cdr. Sullivan and Cdr. Burin to plaintiff's allegations to the BCNR. The advisory opinion gave the following views:

> The charge that a conflict existed between the member and his Division Officer does not prove that the reports were biased or that the reports are not objective evaluations.

> Whether or how the member was counseled does not invalidate the fitness reports.

> While the material the member provides with his petition gives background and insight, it does not pinpoint definitive information that is required to show the fitness reports in error or unjust.

Additionally, the BCNR requested an advisory opinion from the Director, Officer Promotions, Appointments and Enlisted Advancement Division, NMPC–22. An advisory opinion of September 3, 1987, from Cdr. J.S. Falls, Director of the Officer Promotion and Enlisted Advancement Division, via NMPC/BCNR Coordinator to the BCNR/NMPC–22, stated that plaintiff's case did not warrant consideration by a special selection board, since the contested OFRs were valid documents when the FY–88 Active Line Lieutenant Selection Board met. The advisory opinion also conceded that, while removal of the two contested OFRs from VA–52 "would certainly have increased [plaintiff's] competitiveness for promotion," this did not warrant removal of plaintiff's failure of selection.

On September 9, 1987, J.D. Simpson, Jr., Intelligence Assignment Placement Branch, NMPC–4411, wrote the BCNR, "It is our intention to release ... [plaintiff] from active duty at the expiration of his minimum service requirement in May of 1988." All three advisory opinions were forwarded to plaintiff on September 21, 1987.

**9.** Plaintiff later asked the BCNR to suspend its consideration of this request.

In November 1987 plaintiff received orders directing his release at the end of his minimum service obligation. On May 31, 1988, the Navy released plaintiff from active duty. During summer of 1988, he failed of selection when the Fiscal Year 1989 ("FY–89") Reserve Line Lieutenant Selection Board failed to promote him to the grade of Lieutenant (paygrade 0–3). On September 17, 1988, plaintiff transferred to the Selected Reserves. In September 1989 plaintiff transferred to the Individual Ready Reserves. Plaintiff was discharged on May 31, 1990, for twice failing of selection for promotion to lieutenant.

During summer 1988 the BCNR requested an opinion regarding plaintiff's request for reinstatement to active duty. On August 30, 1988, Lt. Cdr. J.R. Reddig, NMPC–4411A, responded to plaintiff's request to be returned to active duty. NMPC–4411A indicated that even had the OFR of July 27, 1985, through September 26, 1986, not been included in his file; had he not failed selection; and were he approaching his end of active duty and requested continuation, "he very probably would have been released anyway." NMPC–4411A attributed plaintiff's release to an austere budgetary climate.

On July 11, 1989, the BCNR issued its decision.[10] The BCNR stated that the OFR for that period was not a fair, balanced, and objective appraisal of plaintiff's performance during the rating period of Cdr. Burin's OFR. The BCNR noted that this contested report mirrored the special OFR prepared by the Cdr. Burin as part of his failed DFC attempt. The BCNR also specifically noted that the contested report assigned without any explanation, grades of "E," "F," and "N" in "Equal Opportunity," "Speaking Ability," and "Writing Ability," all areas where plaintiff received "A's" in the immediately preceding reports. Additionally, the BCNR expressed concern about the absence of anything positive in the report, despite the evidence of record, including the report of the Article 138 investigation, demonstrating that plaintiff deserved at least some measure of favorable comment.

The BCNR further noted that removal of the OFR would have enhanced plaintiff's chances for promotion. Moreover, the Board could not find that plaintiff would have failed of selection even without the OFR. As a result, the BCNR recommended striking both plaintiff's active and inactive duty failures of selection to lieutenant. The BCNR also recommended placing plaintiff before a regularly scheduled promotion board with a corrected record as an officer who had not failed of selection.

As to the OFR for December 3, 1984, through May 31, 1985, extended to July 26, 1985, the BCNR did not find it either erroneous or unjust. The BCNR concluded that this report "[was] an entirely positive appraisal." The BCNR did not find an absence of counseling. Although the BCNR noted that the reporting senior might not have been in a position to observe plaintiff directly with any frequency, this fact alone would not invalidate the block 18 mark for "close" observation. The BCNR noted that the Navy's instruction governing OFRs states that "[c]loseness of observation does not necessarily refer to the physical relationship of the subject officer and the signer of the report."

The BCNR recommended against changing the TAD OFR for April 24, 1986, to September 26, 1986, from a concurrent to a purely regular report. The BCNR remarked that RDML Seely, the reporting senior for this report was not, in fact, plaintiff's regular reporting senior for the period. Additionally, the BCNR noted that Cdr. Burin expressly declined to adopt the report as "regular" and, instead, elected to submit his own report for that period.

The BCNR also recommended against removing the regular COMMATVAQWING-PAC report for September 27, 1986, to February 28, 1987, finding nothing erroneous

---

**10.** In August 1988 the BCNR voted to recommend removal of the July 1985–September 1986 OFR. Plaintiff requested deferral of his reinstatement request pending receipt of the NMPC–4411A advisory opinion.

or unjust in the report. The BCNR indicated that it was not persuaded that this report was influenced by the reporting senior's knowledge of plaintiff's Article 138 complaint and the failed DFC proceedings.

The BCNR recommended the following corrective action to the Secretary: (1) that plaintiff's naval record be corrected by removing the regular OFR from July 27, 1985, to September 26, 1986, prepared by Cdr. Burin, Commanding Officer, VA–52 (dated May 18, 1987); (2) that the Navy insert in plaintiff's record a memorandum to replace the removed OFR; that this memorandum identify the report and state that the report has been removed by order of the Secretary of the Navy; that the Navy withhold the report from selection boards or any other individuals with reviewing authority; and that such boards or individuals may draw no inferences as to the nature of the report; (3) that the Navy correct plaintiff's record so that the earliest possible selection board could consider plaintiff for promotion to the grade of lieutenant; (4) that the Navy correct, remove, or expunge, any material inconsistent with the Board's recommendation from plaintiff's record and that no inconsistent entries or material be added to the record in the future; (5) that the BCNR receive any material removed from plaintiff's record, along with the report of the BCNR's proceedings, for retention in a confidential file maintained for such a purpose and with no cross reference in plaintiff's naval record; and (6) that the Navy deny the remainder of plaintiff's application.

### 5. *Review by the Secretary*

In a July 21, 1989 memorandum to the BCNR, the ASN, the Secretary's designee, concurred in part and disapproved in part the BCNR's recommendation. He concurred with the Board's recommendation not to remove the OFR for the period December 3, 1984, to July 26, 1985. Likewise, he concurred in the BCNR's recommendation not to change the OFR for the period April 24, 1986, to September 26, 1986, from "concurrent" to "regular." He also agreed that the regular OFR from September 27,

1986, to February 27, 1987, should not be removed, as the report was favorable.

The ASN disapproved the BCNR's recommendation to remove the OFR for the period July 27, 1985, to September 26, 1986, and to strike the failures for selection. He disagreed with the BCNR's assessment that the report was unjust, noting that there is no requirement to explain the reason for "each and every rating." He also stated that a number of the graded areas were interrelated and some grades could shed light on related areas as to which Cdr. Burin provided no explanation.

The ASN criticized the BCNR's reliance on the informal investigation of the Article 138 complaint. He pointed out that the Article 138 investigation found that the actions taken by the Command were "within the authority of the Commanding Officer in that [plaintiff] did not perform his duties to the satisfaction of the command." He also noted that the report of the Article 138 investigation declared plaintiff's allegations "wholly without substance."

Lastly, the ASN took exception to the BCNR's removal of the contested OFR based on its virtual similarity to the ones stricken following the failed DFC attempt. Notwithstanding the similarity of the reports, the ASN stated that the Commanding Officer justifiably submitted an identical OFR, since he "did not believe ... [plaintiff] was performing his duties to Navy's standards." The ASN also noted that plaintiff's record still contained the concurrent OFR for the same period recording outstanding performance. In effect, the ASN rejected any recommendation for relief and approved only the BCNR's rejection of relief.

### 6. *Plaintiff's Claims Court action*

Plaintiff filed a complaint *pro se* in the Claims Court on May 30, 1991, and an amended complaint on June 8, 1992, after obtaining legal representation. Plaintiff requests that the Claims Court direct the Secretary of the Navy to correct his records as follows: (1) void the December 3, 1984, to July 26, 1985 OFR and insert into plaintiff's records an adequate neutral ex-

planation for not being rated during that period; (2) void the regular OFR issued for the period from July 27, 1985 to September 26, 1986 and insert an explanation as per request number one; (3) void the April 13, 1987 letter changing the TAD OFR from a regular-concurrent to concurrent report and correct the TAD OFR for April 24, 1986, through September 26, 1986 either by making it a regular OFR or a regular-concurrent report; (4) void plaintiff's failure for selection for promotion by the FY–88 and FY–89 Selection Boards; (5) void plaintiff's release from active duty on May 31, 1988; reinstate him to active duty in the grade of LTJG effective the same date; and award him back pay and allowances due from May 31, 1988, to the actual date of his return to active duty; (6) afford plaintiff promotion reconsideration by a Lieutenant Selection Board applying the criteria and instructions used by the FY–88 Selection Board and, if plaintiff is selected for promotion and promoted, award plaintiff the difference in pay and allowances between a LTJG and a lieutenant for the appropriate period; (7) if plaintiff is passed over for promotion, afford him promotion reconsideration by another Selection Board and award him back pay and allowances if then selected for promotion; (8) void plaintiff's May 30, 1990 discharge; (9) correct all of plaintiff's records and all related Department of Navy records in accordance with the above; and (10) provide such other relief as the court deems necessary to afford plaintiff full relief.

### DISCUSSION

Plaintiff asks the court to pass on, *inter alia,* the validity of various OFRs' from 1984–87, his failures of selection, his May 1988 active duty discharge, and his 1990 discharge for twice failing of selection to the rank of lieutenant. However, plaintiff really challenges only the OFR for the peri-

od July 1985—September 1986. Plf's Br. filed June 8, 1992, at 27 n. 52. Defendant does not dispute the chronology or substance of plaintiff's service in the Navy. However, defendant challenges the Claims Court's jurisdiction to award plaintiff the pay and allowances of a lieutenant. Defendant similarly contends that the Secretary of the Navy's decision in this case is nonjusticiable or, in the alternative, that the Secretary's decision was supported by substantial evidence.

### I. *Jurisdiction*

After plaintiff's initial *pro se* complaint and defendant's motion for summary judgment, plaintiff retained counsel, who filed an amended complaint. That complaint deleted plaintiff's original request for "pay and allowances due an officer selected for promotion to Lieutenant by the FY 88 selection board." Amended Compl. filed June 5, 1992, at 16. Instead, plaintiff requests "all back pay and allowances due from May 31, 1988 to the date of his actual return to active duty" and, if selected for promotion, the difference in pay for the appropriate period. *Id.* In its reply brief filed after the amended complaint, defendant apparently withdrew its previous jurisdictional objections.

In any event, the Claims Court has the jurisdiction to decide claims of military personnel based on improper release from active duty. 28 U.S.C. § 1491(a)(1, 2) (1988);[11] *Sargisson v. United States,* 913 F.2d 918, 920–21 (Fed.Cir.1990). Moreover if, as plaintiff alleges, he was illegally discharged from the Navy, he has the right to the pay of the rank he was appointed to until his proper separation from the service. *Sanders v. United States,* 219 Ct.Cl. 285, 296–97, 594 F.2d 804, 810 (1979), (referring to 37 U.S.C. § 204 (1988)).

11. Section 1491(a)(1, 2), provides, as follows:
(1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon ... any Act of Congress or any regulation of an executive department....
(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restitution to office or position ... and correction of applicable records, and such orders may be issued to any appropriate official of the United States....

## II. Justiciability

### 1. Standard of review in military matters

The court is reviewing the decision of the Secretary to overrule a recommendation of the BCNR. As explained later in this opinion, that decision effectively legitimized both the 1985–86 derogatory OFR and plaintiff's May 1988 discharge.

■■■ The military is entitled to great deference in the administration of its affairs. "[S]trong policies compel courts to allow the widest possible latitude to the armed services in their administration of personnel matters." *Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 813; *see also Orloff v. Willoughby,* 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) ("[J]udges are not given the task of running the ... [military].... The military constitutes a specialized community governed by a separate discipline from that of the civilian...."). The Secretary is favored with the rebuttable presumption that he "discharge[d] his duties correctly, lawfully, and in good faith...." *Arens v. United States,* 969 F.2d 1034, 1037 (Fed.Cir.1992) (quoting *Sanders,* 219 Ct.Cl. at 285, 594 F.2d at 813), and the decision to release a reservist is at the Secretary's will. Nonetheless, the case law also establishes that Congress has carved out a window for judicial review of such discretionary determinations by the military. Judicial review would be meaningless if the deference to the military were abject or the review *pro forma;* rather, the court is charged with examining the record to ascertain if an officer has met his burden of showing that the challenged military action was arbitrary, capricious, unsupported by substantial evidence, or in violation of the law. *Sanders,* 219 Ct.Cl. at 300, 594 F.2d at 809–10.

### 2. Scope of review

Defendant asserts that 10 U.S.C. § 681(a)(1988), controls the disposition of this case. The statute provides:

(a) Except as otherwise provided in this title, the Secretary concerned may at any time release a Reserve under his jurisdiction from active duty.

According to defendant, this statute gives the Secretary virtually unfettered and absolute discretion to discharge an active duty reservist. In any event, defendant reasons, plaintiff's May 1988 discharge occurred by operation of law. Therefore, since the Secretary discharged plaintiff at the end of a four-year minimum obligation, there is nothing for the court to review. Defendant argues, in the alternative, that the OFR at issue did not violate regulations and that, even if it did, the OFR did not substantially contribute to plaintiff's May 1988 discharge. Finally, defendant maintains that the Secretary's July 1989 decision overruling the BCNR was not arbitrary or capricious.

Plaintiff agrees that 10 U.S.C. § 681 bears on the case. Plaintiff points out, however, that the first sentence of the statute provides that other statutes may limit the Secretary's power to discharge reservists at will. 10 U.S.C. § 6011 (1988), provides that the Secretary may issue regulations and that "regulations issued pursuant to that authority 'modify the Secretary's discretion to discharge at will reserve commissioned officers.' " Plf's Br. filed June 8, 1992, at 30 (quoting *Gifford v. United States,* 23 Cl.Ct. 8, 23 (1991)). Plaintiff argues that legally and factually erroneous OFRs violated applicable naval regulations and contributed to his passovers and release from active duty.

■■■ Defendant correctly observes that 10 U.S.C. § 681 "does not place any procedural or substantive limitations on the Secretary's discretion." *Sargisson,* 913 F.2d at 921 (citing *Woodward v. United States,* 871 F.2d 1068, 1071 (Fed.Cir.1989)). Nonetheless, the Secretary does not have absolute or unfettered discretion. He must comply with departmental regulations that limit his discretion to release servicemembers from active duty. *Murphy v. United States,* 16 Cl.Ct. 385, 390 (1989), *subsequent proceedings,* 22 Cl.Ct. 147 (1990), *appeal pending,* No. 92–5086 (Fed.Cir. Apr. 1, 1992) (citing, *inter alia, Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1

L.Ed.2d 1403 (1957)). Thus, the Claims Court, in an appropriate case, may review the Secretary's decision to release a reservist from active duty in order to ensure that the Secretary has complied with applicable regulations.

■■■ In order to establish justiciability, plaintiff must do more than merely allege the Secretary's violation of a regulation. The regulation at issue must contain tests and standards enabling the court to decide the controversy. *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir.), *cert. denied*, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988) (citing, *inter alia Greene v. McElroy*, 254 F.2d 944, 953 (D.C.Cir.1958), *rev'd on other grounds*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)). The Federal Circuit explained that the Claims Court may review military discharge claims for procedural, but not substantive, error. *Voge*, 844 F.2d at 780. The court also noted that "there is a significant difference between relatively minor and routine military personnel actions ... and ... allegedly unlawful discharge from military service because of statutory violations by the military departments...." *Id.* at 780 n. 1. In the latter case, a court objectively reviews the matter for legal or procedural violations, rather than by subjectively second-guessing the correctness of a particular personnel decision.

3. Standards for review of Secretary's decision

■■■ 10 U.S.C. § 1552(a) (1988), provides that the Secretary may alter a military record when necessary to correct an error or remove an injustice. The section further provides that the Secretary acts through the military correction board in making a records correction determination.

The statute confers a certain amount of discretion on the Secretary, including the discretion to "differ with ... [a board's] recommendations ... where the evidence is susceptible of varying interpretations." *Sanders*, 219 Ct.Cl. at 299, 594 F.2d at 812 (citing *Boyd*, 207 Ct.Cl. at 11). In *Boyd v. United States*, the Court of Claims articulated the appropriate standard of review:

The court ... may reject the decision of the Secretary only if he has exercised his discretion arbitrarily, capriciously, in bad faith, contrary to substantial evidence, or where he has gone outside the board record, or fails to explain his actions, or violates applicable law and regulations....

207 Ct.Cl. 1, 8, (1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976); *see also Sanders*, 219 Ct.Cl. at 299, 594 F.2d at 812.[12] In such a case, the Claims Court may reverse the Secretary's decision to overrule a correction board. *Id.; see also Weiss v. United States*, 187 Ct.Cl. 1, 5, 408 F.2d 416, 418 (1969).

■■■ In reviewing the Secretary's decision or a correction board's determination, the court applies a two-part test. First, plaintiff must first establish that the OFR or the BCNR proceedings contained legal error or a misstatement of a significant hard fact.[13] *Hary v. United States*, 223 Ct.Cl. 10, 17, 618 F.2d 704, 708 (1980); *Sanders*, 219 Ct.Cl. at 301–02, 594 F.2d at 813. Plaintiff cannot "merely allege or prove that an OFR seems inaccurate, incomplete or subjective in some sense." *Hary*, 223 Ct.Cl. at 17, 618 F.2d at 708. Plaintiff must show a clear and prejudicial violation of a statute or regulation or, alternatively, a misstatement of a significant hard fact.[14]

---

12. The Court of Claims imposed an affirmative duty on the Secretary: to afford a serviceman proper relief, including correcting records to redress an error. *Sanders*, 219 Ct.Cl. at 299, 594 F.2d at 812. The Secretary "may not arbitrarily overrule the recommendations of the Board where its findings are justified by the record." *Neal v. Secretary*, 639 F.2d 1029, 1043 n. 13 (3d Cir.1981) (citation omitted).

13. The Court of Claims also characterized the type of erroneous action that justifies reversal

as a "gross material error of fact;" "an action contrary to all the evidence," *see e.g., Sanders*, 219 Ct.Cl. at 301, 594 F.2d at 813–14; or "a decision so unsupported by evidence as to be a gross injustice." *Skinner v. United States*, 219 Ct.Cl. 322, 333, 594 F.2d 824, 830 (1979).

14. The legal error and misstatement of a significant hard fact requirements dovetail with the previously stated requirement of "tests or standards" by which a court can decide the controversy. *Cf. Voge*, 844 F.2d at 780.

■ Second, plaintiff must make a *prima facie* showing of a substantial connection or causal nexus between the error and the promotion passover or release from active duty. *Engels v. United States*, 230 Ct.Cl. 465, 468–69, 678 F.2d 173, 175 (1982); *Hary*, 223 Ct.Cl. at 15, 618 F.2d at 706–07. The causal nexus analysis, in turn, involves two interrelated questions: 1) "[W]as the claimant's record prejudiced by the errors in the sense that the record appears worse than it would absent the errors ..., [and 2] even if there was some such prejudice, is it unlikely that he would have been promoted in any event? ..." *Engels*, 230 Ct.Cl. at 470, 678 F.2d at 176. On the former question, plaintiff bears both the burden of production and of persuasion. *Id.* On the latter question, plaintiff must present enough evidence to generate the issue, but "the end-burden of persuasion falls to the government to show harmlessness—that despite the plaintiff's *prima facie* case, there was no substantial nexus or connection [of the legal error to the promotion passover or discharge]." *Id.* at 468, 678 F.2d at 175.[15]

III. *The July 1985 to September 1986 OFR*

■ Plaintiff asks the court to void the OFR submitted by VA–52 in May 1987 for the period July 1985 to September 1986. Plaintiff argues that the personal bias and animosity of both Ens. Canfield and Cdr. Burin infected the negative OFR,[16] that the OFR violated naval regulations, and that the OFR contained significant misstatements of hard fact.

1. Legal error

Plaintiff alleges that the 1985–86 OFR violated Naval Military Personnel Command Instruction 1611.1 (May 12, 1981) ("NAVMILPERSCOMINST"), by failing to substantiate letter grades in the OFR's narrative evaluation section. Plaintiff maintains that the OFR did not contain objective and realistic grades. Plaintiff further charges that Cdr. Burin failed to note plaintiff's specific attainments as a naval officer during the period in question.

Defendant, quoting the Secretary's letter partially overruling the BCNR decision, rejoins that there is " 'no requirement to explain the reason for each and every rating....' " Def's Br. filed July 16, 1992, at 12. In the alternative, defendant contends that the OFRs substantiate and support the adverse ratings given plaintiff.[17]

Defendant does not, and indeed cannot, dispute that the OFR at issue is totally derogatory. Cdr. Burin gave plaintiff adverse ratings in every rated category. NAVMILPERSCOMINST 1611.1, § 5–21 (May 1, 1981), counsels:

[t]o be effective, the narrative must present a clear, concise and accurate word-picture of the officer and substantiate the letter grades assigned on the front of the Fitness Report.

---

**15.** The case law applies this analysis to review of a correction board's decisions, as well as the Secretary's overruling of a correction board's decision. Therefore, if the court finds that plaintiff has met the legal error/nexus test, the Secretary's decision overruling the BCNR decision on the 1985–86 OFR could be arbitrary, capricious, and not justified by the record. *Neal*, 639 F.2d at 1043 (citing *Nelson v. Miller*, 373 F.2d 474, 478 (3d Cir.), *cert. denied*, 387 U.S. 924, 87 S.Ct. 2042, 18 L.Ed.2d 980 (1967)).

Declaring a case justiciable necessarily involves discussing the merits of the case. If the court does not find either legal error/misstatement of a significant hard fact in the OFR and a causal nexus to plaintiff's passover or discharge, then the case is nonjusticiable; if the court finds the requisite errors and nexus, the case is justiciable.

**16.** Absent legal error, personal bias or animosity alone in the rating process could not void an OFR. *See Guy v. United States*, 221 Ct.Cl. 427, 433, 608 F.2d 867, 870–71 (1979) ("[P]erfect objectivity in the rating process cannot be expected or even hoped for. The process of evaluating officers by other officers is an inherently subjective process...."); *cf.* 10 U.S.C. §§ 3442(c), 8442(c) (1976) (repealed 1980) (requiring that record presented to a selection board had to portray an officer's career in a "fair and equitable" manner).

**17.** Defendant has not rebutted plaintiff's argument that naval regulations require an objective, realistic, and complete evaluation of an officer's strengths and weaknesses. Defendant maintains that the senior rating officer grades as he sees fit.

(Emphasis added.) NAVMILPERSCOM-INST 1611.1, § 6–2(c)(11) provides that before actually preparing an OFR, the reporting senior

> *should* ... review the narrative evaluation in light of each of the personal characteristics listed in sections 67 through 72 [the 'personal traits' category] ... [and][m]ake certain that any mark indicating a particularly superlative or less than average characteristic is supported in the narrative evaluation....

(Emphasis added.)

■ The Secretary must comply with the regulations that he promulgates, *Sargisson*, 913 F.2d at 921. Coercion in the rating process, *Engels*, 230 Ct.Cl. at 469, 678 F.2d at 175; failure to include in a claimant's file a favorable evaluation letter, *id.;* and expression by the rater of dislike for the plaintiff, *Hary*, 223 Ct.Cl. at 16, 618 F.2d at 706, all violate applicable military regulations.

■ The regulations at issue grant the senior rating officer discretion in completing OFRs. An OFR does not violate regulation, and therefore constitute legal error, unless the rater contravened an express mandate of the regulation. In this case NAVMILPERSCOMINST 1611.1, § 5–21's first sentence does not obligate the rater to substantiate all ratings. Rather, the provision announces that "to be effective," the narrative must substantiate ratings. Read in context, this section gives the rater guidance, but does not require compliance.

■ In a similar vein, NAVMILPER-SCOMINST 1611.1, § 6–2(c)(11) counsels that the narrative evaluation should support less than average "personal traits" ratings (blocks 67–72 on the OFR) in the narrative evaluation.[18] Like the previously discussed regulation, section 6–2(c)(11) does not contain mandatory language. On the contrary, the provision serves more as a checklist that the rating official should employ. Cdr. Burin's failure, if any, to substantiate negative personal traits ratings does not run afoul this regulation and

therefore render the OFR a nullity. To the extent that the narrative evaluation did not substantiate the ratings, it did not comport with the spirit of NAVMILPERSCOMINST 1611.1. Nevertheless, the court finds no legal error in the OFR as to NAVMILPER-SCOMINST 1611.1, §§ 5–21 (first sentence) and 6–2(c)(11).

■ Plaintiff argues that the 1985–86 OFR was not an objective, realistic, and complete evaluation, as required by NAV-MILPERSCOMINST 1611.1, §§ 2–1, 4–3(c),(h), 4–11(a), and 5–21. Plaintiff also points to section 4–11(e), which states that "[a]ttainment of specific qualifications during the reporting period must be recorded...." For its part, the BCNR voided plaintiff's 1985–86 OFR because it was "not a fair, balanced and objective appraisal of his performance." Defendant only obliquely addresses this issue by denying that Cdr. Burin displayed any bias and arguing that a rating officer has complete discretion to give any ratings called for in his professional judgment.

NAVMILPERSCOMINST 1611.1 § 2–1 defines OFRs as

> the principal document in an officer's record and ... the primary basis of comparing and selecting officers for promotion.... Realistic, objective evaluations of individual officers are essential to the accomplishment of ... [this] task....

Furthermore, section 4–3(c) mandates that "reporting seniors must make a determined effort to mark objectively ... [and must] [e]nsure realistic marks are assigned officers whose performance of duty has been marginal or unsatisfactory...." The first sentence of section 5–21 mandates that "the reporting senior must ensure that the strengths, weaknesses, and potential of the officer being evaluated are fully discussed."

■ The court cannot require, or even expect, absolute objectivity in OFR preparation. *Guy v. United States*, 221 Ct.Cl.

---

**18.** Plaintiff, the Secretary, and defendant misconstrue NAVMILPERSCOMINST 1611.1, § 6–2(c)(11) by comparing ratings from the "specific aspects of performance" row (blocks 29–37) with the narrative evaluation; rather, the directive applies to blocks 67–72.

427, 433, 608 F.2d 867, 870–71 (1979). Likewise, the court recognizes the inherent difficulty in assessing OFRs for objectivity and inclusiveness. This case, however, presents a glaring example of an impermissibly subjective and incomplete OFR.

The chronology documented in plaintiff's record reveals Cdr. Burin's disregard of the applicable OFR regulations. In April 1986 Cdr. Burin submitted a special and regular OFR in conjunction with his request for plaintiff's DFC. Cdr. Burin rated plaintiff adversely in virtually every rated category. In August 1986 CHNAVPERS rejected Cdr. Burin's DFC request. In addition, CHNAVPERS removed the April 1986 OFR from plaintiff's file and directed Cdr. Burin to review Naval Military Personnel Manual § 3410100 5 in the preparation of a new OFR for the same rating period.[19] Incredibly, in March 1987 Cdr. Burin submitted an OFR that essentially duplicated the rejected OFR.

To be sure, Cdr. Burin's evaluation represented his own opinion and judgment of plaintiff's performance. Nevertheless, NAVMILPERSCOMINST 1611.1 requires realistic and objective OFRs. A realistic and objective OFR would have noted and explained the dramatic differences between Cdr. Sullivan's immediately preceding positive OFR and Cdr. Burin's entirely negative appraisal. A realistic and objective OFR would have discussed plaintiff's strengths, important in the context of an officer whose performance was marginal or unsatisfactory. See NAVMILPERSCOMINST 1611.1, §§ 4–3(c), 5–21. The BCNR found that the OFR was unfair and unobjective because it reiterated the negative report that was explicitly rejected as part of the DFC proceeding and failed to explain the obvious discrepancies with the OFR issued by Cdr. Sullivan. The court agrees. Cdr. Burin's totally pejorative narrative evaluation violated the clear mandate of NAVMILPERSCOMINST 1611.1 §§ 2–1, 4–3(c), 4–11(e), and 5–21 and, therefore, consti-

tutes legal error. The Secretary's decision to the contrary was arbitrary and capricious since the BCNR's decision was justified by the record.

**2. Misstatement of significant hard fact**

Plaintiff also contends that Cdr. Burin misstated a significant hard fact by entering in the narrative evaluation "notable decline in performance last four months...." Plaintiff points out that during the last five months of the regular rating period, i.e., April–September 1986, he was on TAD at NAS, Whidbey Island, Washington, and therefore not under Cdr. Burin's direct supervision. Moreover, plaintiff contends that he received an exemplary OFR for that five-month period. Defendant does not refute this argument.

■ A misstatement of a significant hard fact (or, alternatively, a gross material error of fact) can rise to the level of legal error and overcome the presumption of correctness accorded the military in the preparation of OFRs. Hary, 223 Ct.Cl. at 17, 618 F.2d at 708; Sanders, 219 Ct.Cl. at 301–02, 594 F.2d at 813; Rogers v. United States, 24 Cl.Ct. 676, 686–87 (1991). In Rogers the Army stated in a discharge certificate that on October 5, 1982, plaintiff had failed successfully to complete a drug abuse rehabilitation program. The Claims Court found that the Army misstated a significant hard fact because plaintiff legally could not have been identified as subject for the drug rehabilitation program until October 27, 1982.

■ Cdr. Burin made a similar chronologically and factually erroneous statement. He transferred plaintiff TAD to Whidbey Island in April 1986 as part of the DFC action. Plaintiff remained TAD through September 1986, during which time plaintiff was not under Cdr. Burin's direct supervision. In an OFR dated September 26, 1986, covering the period from April to September 1986, RDML Seely,

---

**19.** Naval Military Personnel Manual § 3410100 5(i)(2) provides that "[m]aterial relating to a request for detachment of an officer for cause shall not be attached to *or referenced in* fitness reports submitted subsequent to initiation of the

detachment for cause request...." (Emphasis added.) When Cdr. Burin submitted an OFR that reiterated the DFC special OFR, he violated the spirit, if not the letter, of this regulation.

plaintiff's senior rating officer at Whidbey Island, gave plaintiff all 'A' ratings and did not note any weaknesses.

However, in May 1987, following the DFC rejection and denial of plaintiff's Article 1106 and Article 138 complaints, Cdr. Burin changed RDML Seely's report from regular-concurrent to concurrent. As a result, Cdr. Burin could rate plaintiff for the TAD period spent at Whidbey Island. He also extended the rating period of the rejected OFR from April to September 1986, the precise period during which plaintiff served under RDML Seely.[20] The action itself was authorized.

The OFR Cdr. Burin prepared for July 27, 1985, to September 26, 1986, contains a misstatement of a significant hard fact. Cdr. Burin's May 1987 OFR narrative evaluation for plaintiff notes in block capital letters under the heading "Unreliable and unprofessional air intelligence officer," *"Notable decline in performance last four months."* (Emphasis added.) This is a false statement of fact.

Cdr. Burin's OFR covered the period until September 26, 1986. Therefore, the alleged four-month decline in plaintiff's performance stretched back to May 26, 1986. During this entire period, plaintiff served under RDML Seely at Whidbey Island. In September 1986 RDML Seely prepared an OFR covering that April to September 1986 period. He assigned plaintiff "A"'s in every rated category and rated plaintiff's "Mission Contribution" as "High." Under block 77, "Weaknesses Discussed," RDML Seely checked "None Noted." Moreover, RDML Seely's lengthy narrative evaluation described plaintiff as "an excellent naval officer who has made exceptional contributions to the mission of this command ... he has accomplished all of his duties exceptionally well." RDML Seely also described plaintiff as a "resident expert" in certain

security matters. RDML Seely noted that plaintiff composed and implemented a comprehensive security plan, aided in the authoritative evaluation of squadron intelligence and operational readiness, conducted a meticulous revalidation of the intelligence publication account, and authored an intelligence exam.

Therefore, Cdr. Burin's statement regarding plaintiff's decline in performance from May to September 1986 is, at best, misleading. In context, the statement grossly and unjustifiably misrepresents plaintiff's record. As Cdr. Burin knew (since he ordered plaintiff's transfer), plaintiff performed no duties for VA–52 during the last four months of the rating period. Furthermore, Cdr. Burin was aware that RDML Seely had rated plaintiff because Cdr. Burin changed the status of RDML Seely's report in the course of submitting his own OFR. Cdr. Burin extended the rating period so that the new OFR would cover the time plaintiff spent in Whidbey Island. Nevertheless, Cdr. Burin submitted an OFR that recorded a "notable decline over the last four months." This statement tarnished plaintiff's record. This is a misstatement of a significant hard fact rising to the level of legal error.

The misstatement of a significant hard fact and the application of negative ratings to a rating period when Cdr. Burin did not have direct supervision over plaintiff and during which plaintiff received a exemplary OFR also constitute a violation of NAVMILPERSCOMINST 1611.1, §§ 2–1, 4–3 and 5–21's objectivity and inclusivity requirements. Cdr. Burin had notice of RDML Seely's superlative OFR containing a narrative evaluation totally at odds with his own. Yet, Cdr. Burin prepared an wholly derogatory OFR purporting to cover a five-month period (plaintiff having left

**20.** A regular-concurrent OFR is completed "where all aspects of an officer's performance have been adequately covered in a concurrent report and the regular reporting officer has no meaningful evaluations to contribute...." NAVMILPERSCOMINST 1611.1, § 2–10. The regular reporting senior retains the discretion to accept a concurrent reporting senior's designation of a OFR as "regular." A concurrent reporting senior (usually a commanding officer who observes the ratee during a temporary assignment) may also complete a concurrent OFR. These reports "are considered desirable when the officer cannot be observed over an extended period of time by the regular reporting senior, or when the officer is under the operational ... control of another commander...." NAVMILPERSCOMINST 1611.1, § 2–9.

in April) when he had no contact with plaintiff whatsoever. Since Cdr. Burin's ratings were identical to those given in the rejected July 1985 to April 1986 OFR, their validity is suspect at least as to the subsequent five-month period during which plaintiff was physically separated from Cdr. Burin. The record admits of no other finding but that the July 1985 to September 1986 OFR submitted by Cdr. Burin upon plaintiff's detachment contained legal error and misstatements of significant hard facts. The Secretary's decision to the contrary was arbitrary and capricious since the BCNR's findings were justified by the record.

### 3. Nexus analysis

■ Plaintiff is required to make a *prima facie* showing of a causal nexus between the legal errors and misstatement of significant hard fact and plaintiff's promotion passovers and release from active duty. *Hary*, 223 Ct.Cl. at 17–20, 618 F.2d at 706–09. First, plaintiff must demonstrate that his record was prejudiced by the errors.

The following represents a list of all the reports made part of plaintiff's file before the BCNR. Column marked "NO." refers to the numerical order of the report in this case's chronology. "OFFC." refers to the officer or command issuing the report. "DATE" indicates the dates covered by the report. "TYPE" indicates whether the report was regular, concurrent, special, or not observed (NTO). "%" corresponds to the percentile ranking for an individual having the ratings for the specific report. "GRADE" refers to the alphabetic grades received in the reports. "PRM" refers to whether a promotion was recommended by the rating officer (regular, early, or not recommended).

The identical reports ordered stricken following the failed DFC attempt are No.'s 6 and 7. The ratings on these reports are identical to contested report No. 9. The OFR at issue is indicated by underscoring.

### PLAINTIFF'S OFFICER FITNESS REPORTS

| NO. | OFFC. | DATE | TYPE | % | GRADES | PRM. |
|---|---|---|---|---|---|---|
| 1 | NASC | 5/11/84–5/18/84 | NTO | NA | NA | NA |
| 2 | AFAOTC | 5/19/84–10/26/84 | NTO | NA | NA | NA |
| 3 | VA128 | 10/27/84–12/03/84 | NTO | NA | NA | NA |
| 4 | CVN70 | 10/18/84–5/24/85 | CON | 5% | 13A/9B | REG |
| 5 | VA52 | 12/03/84–5/31/85 | REG | 5% | 4A/14B/4C | REG |
| 6 | VA52 | 7/27/85–4/18/86 | SPE | UNSAT | 1E/2F/1G/4H/13I | NO |
| 7 | VA52 | 7/27/85–4/23/86 | REG | UNSAT | 1E/2F/1G/4H/13I | NO |
| 8 | CMVWP | 4/24/86–9/26/86 | CON | 1% | 20A | REG |
| 9 | VA52 | 7/27/85–9/26/86 | REG | UNSAT | 1E/2F/1G/4H/13I | NO |
| 10 | CMVWP | 9/27/86–2/28/87 | REG | 1% | 17A/3B | REG |

Without the offending OFR, plaintiff had an exemplary naval record on review before the FY–88 Selection Board. The July 1985–September 1986 OFR was the only negative OFR in the record. Every other OFR rated plaintiff in at least the top 5 percent of all officers in his job category. Only one OFR gave plaintiff any ratings below "B," and, even then, plaintiff received only four "C"s out of 22 grades assigned. By contrast, Cdr. Burin's OFR contains no rating above "E" and no positive comment whatsoever. Moreover, the OFR narrative evaluation portrayed an officer with a deteriorating naval record over the course of the rating period. Plaintiff has met his burden of showing that the errors committed by Cdr. Burin prejudiced his record.

Even if there was some prejudice, is it unlikely that plaintiff would have been promoted in any event?[21] *Engels*, 230 Ct.Cl.

---

**21.** Contrary to defendant's implications in its reply brief, the nexus analysis does not include a "but for" or "actual cause" test. Neither the Court of Claims nor the Federal Circuit has ever

465, 470, 678 F.2d at 175. The unanimous BCNR decision stated, in pertinent part: *The Board is confident that removing such an unfavorable report would have enhanced Petitioner's chances for promotion, and the Board is unable to find that he would have failed of selection in any event.* Accordingly, the Board urges that both his active duty and inactive duty failures of selection to lieutenant be stricken. The Board feels that his placement before a regularly scheduled promotion board with a corrected record, in the status of an officer who has not previously failed of selection, will provide him adequate relief. Every OFR, except Cdr. Burin's defective report, recommended plaintiff for promotion. Two of those reports strongly or highly recommended plaintiff for promotion and augmentation into the regular Navy. None of them contained any negative narrative, let alone derogatory criticism of his performance. Furthermore, Cdr. Falls, Director of NMPC–22, stated in his letter dated September 3, 1987, in response to the BCNR's request for an advisory opinion, that "[i]n my opinion, removal of the two reports [the July 1985–September 1986 OFR and the December 1984 to May 1985 OFR] would certainly have increased ... [plaintiff's] competitiveness for promotion...."[22] Finally, RDML Seely wrote a letter dated June 2, 1987, to the FY–88 selection board rating plaintiff "highly competitive with the best of his peers in the intelligence community," and most strongly recommending him for promotion.[23]

Plaintiff has met his burden of production on the nexus issue and therefore has made out a *prima facie* case of a nexus between the erroneous OFR and his promotion passover. Defendant has the end-burden of persuasion on this issue. *Engels*, 230 Ct.Cl. at 470–71, 678 F.2d at 175. In this case defendant has failed to point to

evidence in the record, and the court does not discern any, showing the lack of a substantial nexus between the "new" May 1987 OFR and plaintiff's initial passover. Defendant proffers evidence relating to the active duty discharge, but offers no evidence rebutting plaintiff's contentions about the promotion passovers. Consequently, consistent with the BCNR's decision, the court voids the FY–88 promotion passover.

It follows that if the court voids plaintiff's FY–88 passover, the court must void plaintiff's second passover because, under the above analysis, it was tainted by the inclusion of an erroneous and prejudicial narrative evaluation and the first passover. "The inherently detrimental nature of the presence of passovers in a serviceman's record is already known to this court....", *Hary*, 223 Ct.Cl. at 22, 618 F.2d at 711, and defendant acknowledged in a previous case that "previous passovers may detrimentally affect promotion opportunities...." *Sanders*, 219 Ct.Cl. at 312, 594 F.2d at 819. As a consequence, the court must also void plaintiff's 1990 discharge for twice failing of selection.

### 4. Active duty discharge

Plaintiff already has proved that his record appears worse with the offending OFR. Accordingly, the court must turn to whether, given prejudice in the post-DFC OFR, it was unlikely that plaintiff would have been retained on active duty in any event. *Hary*, 223 Ct.Cl. at 21, 618 F.2d at 710. Because plaintiff requested that the BCNR suspend its consideration of his request for reinstatement to active duty, the Board did not address the issue.

By September 9, 1987, less than two months after plaintiff's first passover, NAVMILPERSCOM decided to release plaintiff from active duty. At that time neither NAVMILPERSCOM nor any other

---

required a plaintiff to show a conclusive causal connection between the prejudicial error and promotion passover or release.

**22.** NMPC–22 did not believe the OFRs to be defective or unobjective.

**23.** This OFR was the most recent evaluation of plaintiff's performance before the FY–88 selection board.

naval entity provided a reason to the BCNR for the decision. In November 1987 CHNAVPERS issued orders directing plaintiff's May 1988 release. Without the offending OFR, plaintiff's naval record presents "a picture of steady advancement and increased competence and efficiency." *Riley v. United States,* 221 Ct.Cl. 308, 312–13, 608 F.2d 441, 443 (1979). The only negative commentary on plaintiff's entire performance as a naval officer emanated from the offending OFR. Furthermore, the Navy decided to release plaintiff less than six weeks after his promotion passover. As noted above, the record soundly supports a finding that this passover emanated from the defective OFR. Plaintiff has presented enough evidence to generate the issue of a substantial connection of the defective OFR to his release.

Defendant makes two arguments to show the lack of a substantial connection of the offending OFR to plaintiff's release from active duty. First, defendant submits that release from active duty at the end of a minimum service obligation is automatic unless the servicemember formally requests an extension of service. Defendant points to SECNAVINST 1920.6A (Nov. 21, 1983), and states that, inasmuch as the Navy did not violate that regulation, plaintiff's release was unrelated to any OFRs.

Defendant misconstrues the applicable regulations. SECNAVINST consists of instructions promulgated by the Secretary of the Navy "[t]o establish policies, standards, and procedures for the administrative separation of Navy and Marine Corps officers from the naval service in accordance with.... [relevant statutes and Department of Defense directives]." SECNAVINST 1920.6A, at 1. SECNAVINST 1920.6A § 1(b)(5), referred to by defendant, applies only to personnel who have been twice passed over for promotion. In September 1987 plaintiff had been passed over once. Moreover, Naval Military Personnel

Manual § 3820150 (Apr. 1983), states that "[a] Naval Reserve officer ... desiring release from active duty at or beyond his or her minimum service requirement (MSR) must notify CNMPC by letter at least six months but not more than nine months prior to the month RAD [release from active duty] is desired...." Bureau of Naval Personnel Manual § 1030100 9 (Jan. 1979), provides:

> Approximately six months prior to the termination of an active duty agreement, the officer will be automatically considered for a new agreement. Officers whose agreements are not renewed and who have not requested release to inactive duty will be retained on active duty in an indefinite status or released to inactive duty subject to the needs of the service.

Therefore, an officer is required to inform Naval Personnel of a desire to be released, but has no obligation to inform the Navy that he wants to remain on active duty.[24] The Navy considers every officer for a new active duty agreement; there is no automatic, operation of law, discharge at the end of a minimum service obligation.[25]

Second, defendant refers to NMPC–4411A's letter dated August 30, 1988, sent to the BCNR in response to its request for an advisory opinion on plaintiff's requested reinstatement to active duty. The advisory opinion from NMPC–4411A concluded:

> If LTJG Germano's record did not include the Fitness Report for 27 Jul 85 to 26 Sep 86, and he had not failed of selection, and was not approaching the end of obligated service, and had requested continuation on active duty, he very probably would have been released anyway.

NMPC–4411A gave four reasons for plaintiff's release. First, NMPC pointed to an austere budgetary climate created by congressionally-mandated cuts in officer strength, especially in the intelligence sec-

---

**24.** Defendant faults plaintiff for never requesting an extension of service as permitted by Bureau of Naval Personnel Manual § 1030150. This is a permissive regulation. In any event, plaintiff's requests for correction evinced a clear desire to remain on active duty in the Navy.

**25.** Of course, the September 1987 decision, coming eight months before his release date, preempted the six-month regulatory opportunity plaintiff had to inform the Navy of his desire to remain on active duty.

tor. According to NMPC–4411A, nonaugmented officers, such as plaintiff, bore the brunt of these cuts. NMPC–4411A maintained that the Navy released plaintiff due to these cuts.

Second, plaintiff was not clearly promotable because he consistently received "B" ratings in a highly competitive environment where excellence, *i.e.*, all "A" ratings, was the norm. Third, NMPC–4411A noted that in 1986 plaintiff refused several offered tours of duty to pursue administrative actions against VA–52. Consequently, NMPC–4411A concluded that plaintiff himself contributed to his promotion passover because plaintiff had not acquired sufficient experience in various intelligence areas. Fourth, NMPC–4411A speculated that reinstating plaintiff to active duty to obtain necessary experience was "not a course of action which carries a high probability of success...." Therefore, NMPC–4411A recommended that plaintiff not be recalled to active duty.

NMPC–4411A's *post hoc* explanation of the circumstances surrounding plaintiff's release does not withstand close scrutiny.[26] In a newsletter dated October 16, 1987, included in the administrative record, the Director of Naval Intelligence outlined, *inter alia,* the "[s]tatus and implications of 163X officer reductions." The newsletter explained how FY–87 budget cuts would affect officers in the armed services from FY–87 to FY–89. According to the Director, "Navy's share of this reduction in FY–87 is 1576 officers specified for the grades 0–4 to 0–6 to meet DOPMA grade level controls ... *LT and LTJG are not DOPMA controlled grades and will not be affected.*" (Emphasis added.) Plaintiff was a LTJG both at that time and upon his involuntary release from the Navy. Consequently, the court cannot accept defendant's argument that plaintiff's release followed from congressionally-mandated budget cuts.

NMPC–4411A's characterization that plaintiff's ratings substantially contributed

to his May 1988 release is not supported by the record. In response to plaintiff's request under the Freedom of Information Act for the ratings of all officers before the promotion board, the Navy submitted on July 10, 1987, a list showing percentile (1%, 5%, or 10%), number of grades (A, B, and C), and promotion potential (accelerated, regular, not recommended). It is unclear whether NMPC–4411A considered this document, and defendant did not comment on it. Excluding the defective OFR, NMPC–4411A duly noted that plaintiff received less than all A's (although it is not true that plaintiff consistently received B's) insofar as plaintiff had one OFR that was all A's (versus 72.61% of the candidates who received all A's on all OFRs); two were all A's and B's (versus 25.80%); one had A's, B's, or C's (versus 1.59%). Ninety-four percent of FY–88 officers were promoted. If grades alone were the criterion, which they are not, NMPC–4411A permissibly would have opined that plaintiff was not clearly promotable. Since that is not the case, defendant has not shown that the invalid OFR did not substantially contribute to plaintiff's release.

Defendant also faults plaintiff for refusing several follow-on assignments after his detachment from VA–52. According to NMPC–4411A, plaintiff refused reassignment because he wanted to work on his Article 138 petition and could not gain crucial experience which other officers in his position had already received. NMPC–4411A expressed doubt as to whether plaintiff could "hit the deck running" in a effectively obligatory aircraft carrier assignment. The record does not indicate to what extent, if any, the Selection Board relied on plaintiff's alleged lack of experience.

The court discerns several reasons, however, to view this portion of NMPC–4411A's critique with caution. First, NMPC–4411A misrepresented the impact on plaintiff of the naval officer reductions. Second, NMPC–4411A characterized plaintiff's release as a "difficult decision and not one which would be considered under

---

**26.** Neither the September 1987 notification to the BCNR of Naval Personnel's intent to release plaintiff nor the November 1987 orders to that

effect provided reasons for plaintiff's release. The Navy only provided justification and rationale for plaintiff's release after May 1988.

normal circumstances...." "Normal circumstances" clearly referred to an era where severe budgetary cuts did not impact the naval intelligence. As shown above, these cuts did not impact plaintiff's class of officers. Therefore, under NMPC–4411A's analysis, the Navy should not even have considered releasing plaintiff from active duty. Third, every OFR, except the illegal and factually erroneous report, recommended plaintiff for promotion, and none expressed any doubts about plaintiff's ability to learn and perform complex intelligence tasks. To the contrary, Rear Admiral F.J. Metz ("RDML Metz"),[27] writing in the last OFR submitted before the Selection Board convened, stated that plaintiff "is a talented and capable officer who will *undoubtedly prove himself upon reassignment to a sea duty tour.* He is recommended ... for overseas tours, and promotion." (Emphasis added.) This narrative from a senior officer with direct responsibility over plaintiff refutes NMPC–4411A's assertions that any reinstatement to active duty and to a carrier assignment was futile.

Defendant mischaracterizes the procedures for an officer's release from active duty in general and proffers erroneous explanations for plaintiff's release in particular. In September 1987 the Navy made a conscious decision to release plaintiff. The court finds that this decision was made based on a defective record and that defendant has not met its burden of showing no substantial nexus or connection between the illegal OFR and plaintiff's release from active duty.

IV. *The Secretary's August 1989 decision*

Normally, the court's analysis would end here. Plaintiff has demonstrated the legal error and misstatement of a significant hard fact in the OFR, as well as an adequate nexus to the promotion passover and active duty release. Such a showing is sufficient to either overturn a correction board decision denying relief or, in an appropriate case, a Secretary's decision overruling a correction board's grant of relief. *See Hary,* 223 Ct.Cl. at 15–16, 618 F.2d at 706–07; *Weiss,* 187 Ct.Cl. at 5, 408 F.2d at 418.

In this case, however, the Secretary purported to rely on more than just the BCNR decision in overruling its recommendation regarding the July 1985 to September 1986 OFR and the promotion passover. Likewise, the court's analysis of plaintiff's OFR, while completely consistent with the BCNR recommendation, differs somewhat from that performed by the BCNR.

For its part, the BCNR found that the OFR was not an objective appraisal of plaintiff's performance. Like the court, the BCNR pointed to the lack of objectivity and the complete absence of positive comment in the OFR, especially given the immediately preceding and immediately subsequent OFRs. Furthermore, the BCNR criticized Cdr. Burin's re-submittal of the rejected OFR. The Board implicitly found a nexus between the OFR and plaintiff's promotion passover. Unlike the court, the Board did not call the OFR legally erroneous or find a misstatement of a significant hard fact.

■ In his letter rejecting the BCNR's findings on the OFR and promotion passover issues, the ASN criticized the Board. He correctly stated that there was no requirement for the rater to explain every rating. (In any event, the ASN associated verbiage in the report with various ratings.) The ASN implied that, by signing the report and refusing to make a statement, plaintiff concurred with the findings in the OFR. The ASN noted that, in themselves, the significantly lower ratings on Cdr. Burin's OFR, as compared with that of Cdr. Sullivan, did not invalidate the report. Finally, and most importantly, the ASN favorably cited the Article 138 investigation report that found plaintiff's allegations against Cdr. Burin to be "wholly without substance." Thus, the court must address whether the Secretary's partial reliance on the Article 138 investigation sus-

---

**27.** RDML Metz was plaintiff's commanding officer from September 1986 to February 1988.

tains his decision. The court concludes that it does not.

The court has explained in detail its analysis of plaintiff's defective OFR and its connection to his passover and discharge. This analysis entitles plaintiff to removal of the offending OFRs, voiding the failures of selection, and reinstatement to active duty. To that extent, the court finds the Secretary's decision overruling the BCNR arbitrary, capricious, and not justified by the record. The Secretary's reliance on the Article 138 report, or indeed, on any other document in the record, cannot change the fact that the Navy produced an illegal OFR with a causal nexus to plaintiff's passover and release from active duty.[28]

■ Even were the court to concede that the Article 138 investigation report could provide the Secretary with an alternate basis for overruling the BCNR, such reliance would be arbitrary, capricious, and not justified by the record. In June 1986 plaintiff initiated the Article 138 action against Cdr. Burin. The wrongs alleged in the Article 138 complaint occurred between December 1984 and April 1986. The complaint requested: (1) withdrawal of the DFC request letter, (2) the removal of regular and special OFR for July 1985 to April 1986, (3) promotion to LTJG, (4) retroactive pay, and (5) an investigation into possible wrongdoing by Cdr. Burin and others.[29] Although the investigation partially overlapped the rating period of the OFR at issue in this case, it did not cover the last five months of the disputed rating period. The investigation did not, and could not, consider allegations before the BCNR and the court regarding the OFR at issue in this case because the Article 138 report issued in August 1986, seven months prior to the issuance of the OFR at issue.[30]

Consequently, the Article 138 report did not address the precise issues decided by the BCNR or the court. To wit, the Article 138 report did not evaluate the OFR for objectivity or inclusion of plaintiff's strengths. The report could not have addressed the misstatement of a significant hard fact in plaintiff's OFR because that misstatement was made in March 1987. To be sure, the Article 138 investigation was a legitimate part of plaintiff's record. However, it was not a parallel inquiry to that performed by the BCNR. Consequently, the Secretary's reliance on that report, if any, in overruling the BCNR's OFR decision, does not change the result.

## CONCLUSION

The court concludes that the Secretary acted arbitrarily and capriciously in overruling the BCNR's decision granting plaintiff relief since the Board's findings were justified by the record. The applicable precedent entitles plaintiff to reinstatement, in addition to the relief recommended by the Board.

1. Accordingly, the Secretary of the Navy shall:

a. Void the regular OFR issued for the period from July 27, 1985, to September 26, 1986, and insert into plaintiff's record an adequate neutral explanation for his not being rated during that period;

b. Void plaintiff's failure for selection for promotion by the FY–88 and FY–89 Selection Boards;

c. Void plaintiff's release from active duty on May 31, 1988; reinstate him to active duty in the grade of LTJG effective the same date; and award him back pay and allowances due from May 31, 1988, to the actual date of his return to active duty;

d. Afford plaintiff promotion reconsideration by a Lieutenant Selection Board

---

**28.** Neither the BCNR nor the Secretary ruled on plaintiff's request for reinstatement to active duty. As long as the court finds a nexus between the legal error and the active duty release, the fact that the BCNR and the Secretary did not rule on this point is of no moment.

**29.** Request Nos. 1, 2, and 5 were granted as part of the DFC denial earlier that same month.

Soon thereafter, plaintiff was promoted to LTJG, effectively granting request No. 3.

**30.** An Article 138 is a nonjudicial inquiry into a particular officer's conduct, whereas a BCNR proceeding deals with a servicemember's military record and its accuracy.

applying the criteria and instructions used by the FY–88 Selection Board and, if plaintiff is selected for promotion and promoted, award plaintiff the difference in pay and allowances between a LTJG and a Lieutenant for the appropriate period;

e. If plaintiff is passed over for promotion, afford him promotion reconsideration by another Selection Board and award him back pay and allowances if then selected for promotion;

f. Void plaintiff's May 30, 1990 discharge;

g. Correct all of plaintiff's records and all related Department of Navy records in accordance with the above.

2. By December 30, 1992, the parties shall submit a joint stipulation setting forth the amount due plaintiff. The Clerk of the Court shall enter judgment consistent with the stipulation.

IT IS SO ORDERED.